Filed 3/11/25  P. v. Razdan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KELLON TALIB RAZDAN,<br><br>     Defendant and Appellant. | D081956<br><br><br><br>(Super. Ct. No. SCN425944) |


APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, and Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Kellon Talib Razdan appeals his first degree murder conviction, claiming the jury received insufficient evidence of premeditation and

deliberation.  Razdan also argues the trial court erred in instructing the jury by inaccurately defining premeditation and allowing the jury to consider his flight as consciousness of guilt.  Finally, Razdan challenges the admission of four categories of evidence:  (1) items in his car, recently purchased or otherwise; (2) his internet search history; (3) body-worn camera footage of a witness's statements; and (4) autopsy photographs.  Finding no merit to any of these claims, we affirm the judgment.

## II. BACKGROUND

Razdan and Aris Keshishian were childhood friends, but by the time they graduated high school in 2019 they had drifted apart.  On August 15, 2021, at approximately 7:30 p.m., Razdan drove to the gated community where Keshishian lived, entering through the exit gate after another vehicle departed.  About five hours earlier, Razdan was searching the internet to learn how to remove fingerprints.  In the preceding weeks, Razdan also searched "ax," "sledgehammer," "death by sledgehammer," and "city that doesn't solve murders."

Razdan had a pocketknife and hard knuckle tactical gloves in his center console.  In his trunk, Razdan had a towel, rope, plastic bags, a handsaw, a gas can, duct tape, Gorilla Glue tape, a box cutter, an ax, and a mallet.  Razdan recently purchased the knife, gloves, and Gorilla Glue tape, as well as the black hooded sweatshirt he wore with black pants, black shoes, and black socks.

Razdan said he intended to go to Keshishian's house, but Razdan saw Keshishian walking his dog.  Razdan pulled over, armed himself with the knife, and approached Keshishian in the middle of the street.  By the end of the murder, Keshishian's shirt, sandals, shorts, and hat ended up in the

street.  Both the front and back of the shirt were torn and bloody.  A trail of Keshishian's blood led from the clothes to a nearby driveway.

Melissa Spinelli, who was also walking her dog at the time, observed Keshishian lying in a pool of blood in a driveway.  Keshishian was wearing only underwear, his head resting against a garage wall surrounded by a massive amount of blood; it appeared "like he had slid down the wall." Razdan stood over Keshishian, moving his arm in a punching or stabbing motion into Keshishian's torso.  Keshishian did not fight back as Razdan attacked him.

Spinelli interrupted the attack with a yell, at which point Keshishian pleaded for help and Spinelli told Razdan to get away.  Razdan pivoted towards Spinelli stating, " 'well, he.' "  Razdan did not yell or appear to be excited.  Spinelli said she would release her German Shepard if Razdan came any closer.  Razdan walked to his car and drove away in a relaxed, unhurried manner.

Paramedics responded to Spinelli's 911 call.  Keshishian died shortly afterwards after being transported to a hospital.  Keshishian suffered 44 knife wounds causing his death.  Those wounds were all over Keshishian's body, including his chest, abdomen, shoulders, arms, and back.  Razdan lacerated Keshishian's head three times, and two of the stab wounds he inflicted to Keshishian's back were approximately seven inches deep and could have been fatal by themselves.  Some of the wounds showed "drag marks," consistent with Razdan holding onto the knife as Keshishian fell away from it, and with Razdan standing over Keshishian.

Following the attack Razdan received treatment at the same hospital to which paramedics transported Keshishian.  Razdan suffered deep finger lacerations to the third, fourth, and fifth right-hand fingers and the fourth

3

and fifth left-hand fingers. Razdan's left pinky finger was completely severed above the middle knuckle, and the amputated portion was found in the driveway near Keshishian's body. Razdan's right pinky finger was only connected by a skin bridge at the middle knuckle, and a physician completed its amputation. Razdan also had a superficial scratch on his left biceps for which he did not request treatment. The injuries to Razdan's hands were possibly defensive, but they were also consistent with self-inflicted wounds — Razdan's knife did not have a hand guard to prevent his hand from sliding forward onto the blade.

When receiving treatment, Razdan told a physician and an investigating officer that he injured his hands in a bike chain. Officers arrested Razdan at the hospital. Later the Office of the San Diego County District Attorney charged him with murder.

Razdan testified at his 2023 trial. He stated in the spring or summer of 2021, his Snapchat feed began showing disturbing content. Believing Keshishian hacked the account, Razdan texted Keshishian in May 2021 to confront him. In that exchange, Razdan effectively challenged Keshishian to a fight and called him a coward for not showing up. Razdan thought Keshishian was toying with him and became annoyed.

Then, on August 15, 2021, Razdan decided to confront Keshishian at Keshishian's house. Razdan testified that he went there to fight, not to talk. Razdan admitted putting the various items in his trunk, claiming some were not his. He also stated he kept the knife in his center console for protection, and he bought the tactical gloves for his job.

According to Razdan, when Razdan confronted Keshishian about his phone, Keshishian lunged at him, which led to shoving between the two of them and punches from Keshishian. After Razdan retreated and pulled the

4

unopened knife from his pocket as a last resort, Keshishian grabbed the knife and they wrestled over it. Razdan did not remember how the knife's blade opened or how they ended up in the driveway, but he felt he had to fight for his life. When he heard Spinelli, Razdan believed Keshishian was no longer a threat. Razdan attempted to explain the situation to Spinelli, but she did not seem interested, and he was worried about his injuries. Razdan drove home, attempted to treat his hands in his bathroom, but then went to the hospital at his father's suggestion.

The jury found Razdan guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)), determining that he used a deadly and dangerous weapon (*id.*, §§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)). The trial court sentenced Razdan to prison for 26 years to life. His timely appeal followed.

### III. DISCUSSION

*A.    There Was Sufficient Evidence of Premeditation and Deliberation*

Razdan argues there was insufficient evidence that he murdered Keshishian with premeditation and deliberation. He claims the items found in his car, his internet searches, and his purchases have innocent explanations, and any inference of planning is speculative. Razdan further contends evidence of motive was lacking, and Keshishian died in a frenzied combat after which Razdan exhibited symptoms of shock.

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) "Thus, ' "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' "

5

(*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264.) Nonetheless, " ' " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " ' " (*Mendoza*, at p. 1069.)

Three categories of evidence may inform the analysis of premeditation and deliberation: planning, motive, and manner of killing. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) " 'However, these factors are not exclusive, nor are they invariably determinative.' " (*Ibid*.) Instead, they may simply guide our " ' " ' 'assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*Ibid*.)

Our review of this issue is subject to the substantial evidence standard, under which we consider the record in the light most favorable to the judgment and determine whether the circumstances reasonably justify the jury's findings. (*People v. Mendoza, supra,* 52 Cal.4th at pp. 1068–1069.) Further, " ' " '[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Starting with evidence of planning, Razdan bought the murder weapon approximately one week earlier, and then armed himself with it prior to confronting Keshishian. He also recently purchased the tactical gloves and Gorilla Glue tape he brought with him in his car. These items, as well as the towel, rope, bags, handsaw, gas can, duct tape, box cutter, ax, and mallet in his trunk could be used for murder or disposing of a body. Although these items might also have innocent uses, their presence in Razdan's car combined

6

with his recent internet searches involving similar items, death, and removal of fingerprints strengthen the planning inference. Razdan also recently purchased the black hooded sweatshirt he wore with all black clothing and shoes, indicating an intent to conceal his presence or identity. These circumstances provide significant planning evidence. (See, e.g., *People v. Lee, supra,* 51 Cal.4th at p. 636 [bringing murder weapon to scene indicates planning]; *People v. Jablonski* (2006) 37 Cal.4th 774, 821 ["evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation"].)

As for motive, Razdan admitted he went to confront his former friend intending to fight. Razdan believed Keshishian was responsible for the disturbing content on Razdan's phone, and Razdan was annoyed with Keshishian's previous response to the issue. Evidence of motive was therefore present, and there is no requirement that a motive be rational. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 495.)

Regarding the manner of killing, Razdan cut and stabbed Keshishian 44 times, leaving gaping wounds in Keshishian's chest, abdomen, shoulders and back. Razdan slashed Keshishian's head three times, and two of the deep stabs in Keshishian's back could have been lethal by themselves. Some wounds were consistent with the knife remaining in Keshishian's body as he fell, and with Razdan standing over Keshishian. A trail of Keshishian's blood began in the middle of the street where he lost his clothing. That trail led to the driveway where Spinelli observed Razdan attacking a helpless Keshishian as he lay in a pool of blood appearing to have slid down the garage wall.

Razdan did not stop his attack until interrupted by Spinelli. He did not wait for first responders or seek immediate assistance for Keshishian.

Instead, Razdan calmly drove home and tended his injuries. Razdan's injuries were consistent with self-infliction, given that Razdan's knife lacked a guard to prevent his hand from sliding forward onto the blade.

From these facts, the jury could reasonably infer a preconceived design to kill. (See, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 471 [targeting of vital areas in connection with numerous other wounds suggests premeditation]; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation"]; *People v. Lee, supra,* 51 Cal.4th at p. 637 [calm demeanor supports finding of "preexisting thought and reflection rather than an unconsidered rash impulse"].)

Even if a jury determined the killing started as an unplanned event, they could rationally conclude that Razdan's assault on Keshishian evolved during the attack from an impulsive act to one demonstrating Razdan's reflection on, and decision, to kill Keshishian. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1020 [" 'This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act,' " from which a jury can find premeditation and deliberation].) From the record, it is reasonable to infer that Keshishian retreated to the driveway where he was ultimately defenseless as Razdan continued his bloody attack until interrupted by a bystander. Further, despite the potential innocent inferences Razdan raises, overall, "the circumstances reasonably justify the jury's findings"; therefore, we "may not reverse the judgment merely because . . . the circumstances might also support a contrary finding." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295.)

8

We conclude sufficient evidence supported the jury's finding of premeditation and deliberation.

B.     *The Trial Court Properly Instructed the Jury*

Razdan raises two claims of instructional error, which we review independently, to determine " 'whether the trial court 'fully and fairly instructed on the applicable law." ' " (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.) "[W]e consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. [Citation.] ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*Id*. at p. 798–799.)

1.  Premeditation and Deliberation

The trial court instructed Razdan's jury on premeditation and deliberation using CALCRIM No. 521:

> The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. *The defendant acted with premeditation if he decided to kill before completing the acts that caused death.*
>
> The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. (Original italics omitted, italics added.)

9

Razdan argues the trial court erred by giving the italicized portion of the instruction. He claims that sentence is inaccurate because it was tantamount to merely requiring that he intentionally killed, and the remainder of the instruction did not clarify that error.

"The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) The challenged portion of the instruction adequately conveyed this concept because it required the jury to determine that Razdan's decision to kill preceded his death-causing acts. It therefore imposed a temporal requirement in addition to bare intent to kill. To the extent the sentence may have been ambiguous, the remainder of the instruction clarified that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated," and "[t]he test is the extent of the reflection." The trial court also instructed the jury that an intentional killing is second degree murder unless the People prove first degree murder as defined in CALCRIM No. 521, further explaining that intent to kill and premeditation are distinct concepts. Consequently, we find no error on this ground.

2. Flight

The trial court instructed the jury with CALCRIM No. 372 as follows:

> If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself.

Razdan claims his injuries and Spinelli's threat to release her dog explain why he left the scene. He contends the jury could not properly infer

10

consciousness of guilt from his departure; therefore, the trial court should not have given the flight instruction.

"To obtain the [flight] instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Here, although Razdan was seriously injured. And even though one of his injuries included a severed finger, he did not request assistance from Spinelli or go immediately to the hospital. Instead, he drove home and attempted to treat himself there. He later went to the hospital at his father's urging, where he lied about the source of his injuries. Further, Razdan did not attempt to seek help from law enforcement. When Spinelli interrupted his attack, he merely uttered " 'well, he,' " calmly and quickly deciding to leave without further explanation. Even though Spinelli indicated she would release her dog if Razdan came closer, Razdan's actions were inconsistent with those of a reasonable person acting in self-defense. As such, there was sufficient evidence to suggest that Razdan's purpose in leaving was to avoid arrest, and the flight instruction was proper. Further, the instruction qualifies itself by telling the jury two things. First, if the jury concludes "that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct." The flight instruction does not mandate the jury infer guilt. Second, the instruction states that "evidence that the defendant fled or tried to flee cannot prove guilt by itself." This further insulates a defendant from any misuse of flight evidence. We find the court properly included the flight instruction in its charge to the jury.

C. *Razdan Fails to Show Any Improper Admission of Evidence*

11

Razdan argues the trial court abused its discretion under Evidence Code section 352 in admitting four categories of evidence. Evidence Code section 352 grants courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review a trial court's determination under Evidence Code section 352 for abuse of discretion, and will reverse only if ' " ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*People v. Munoz* (2019) 31 Cal.App.5th 143, 167.)

1. <u>The Items in Razdan's Car and His Recent Purchases</u>

Razdan asserts that except for the knife used in the murder, the items in his car and his recent purchases had no connection to the offense and were innocuous. Razdan also claims evidence regarding the sweatshirt was prejudicial because it "encouraged a racist trope that young males in 'hoodies' are invariably criminals," and there was no demonstrated relevance of what he wore during the murder.

As mentioned above, the items in Razdan's car could be used for murder or disposing a body. Razdan brought these items with him intending to confront Keshishian, which is probative of planning. Razdan's recent purchase of the knife, gloves, and Gorilla Glue tape, as well has his internet searches, strengthen the planning inference. Furthermore, Razdan does not explain how these items were prejudicial, instead characterizing them as innocuous.

The only prejudice identified by Razdan is the potential racist inference from the sweatshirt. However, Razdan was wearing that article of clothing

12

during the murder, giving it forensic probative value. Indeed, both the prosecution and defense questioned a forensic technician about the sweatshirt's condition. Additionally, Razdan recently purchased the sweatshirt and wore it with all black clothing, suggesting planning and intent to conceal himself.

On this record, the trial court properly exercised its broad discretion to admit evidence of the items in Razdan's car and his recent purchase history.

2. Razdan's Internet Searches

Razdan argues his internet searches had no probative value because he did not click on any search results and he did not use or attempt to use an ax or sledgehammer in the crime.

Razdan's characterization of his internet research is incorrect. He clicked on results for "death by sledgehammer" and "city that doesn't solve murders." Additionally, the fact that Razdan searched "how to remove fingerprints," "ax," and "sledgehammer" before driving to confront Keshishian with an ax and mallet in his car is still probative of planning even though Razdan did not explore the search results or ultimately use those items in the murder. The trial court also limited evidence of Razdan's search history, excluding numerous other searches such as those related to firearms, death by falling, and mental health. We see no abuse of discretion regarding this category of evidence.

3. Body-worn Camera Footage of Spinelli's Statements

Sheriff's deputy Michael Lee responded to the scene of the murder and obtained a statement from Spinelli. The trial court initially excluded Deputy Lee's body-worn camera footage of Spinelli's statement because it was cumulative and there was a lot of emotion in the background.

13

When cross-examined by defense counsel, Spinelli acknowledged that in a statement to police officers and her preliminary hearing testimony, she described the altercation between Razdan and Keshishian as a fight. Spinelli then clarified on redirect and recross-examination that although she used the word fight, she observed Razdan attacking Keshishian, and Keshishian did not fight back. An investigating officer later testified that Spinelli did not use the word fight when describing the incident.

Also, the People removed background noise from Deputy Lee's body-worn camera footage and requested admission of two clips totaling 36 seconds. The trial court admitted those two clips, finding them admissible as spontaneous and prior consistent statements. Deputy Lee subsequently testified that Spinelli did not describe the altercation as a fight.

Razdan argues Deputy Lee's body-worn camera footage was unnecessary, irrelevant, and cumulative. Razdan claims the People only sought the video's admission to generate sympathy by showing Spinelli's emotions.

Spinelli's observations were critical because she was the only disinterested eyewitness. Whether she described the altercation as a fight or an attack was important because Razdan claimed self-defense. Razdan's counsel also challenged Spinelli's credibility. Direct evidence of Spinelli's statements shortly after the murder were therefore relevant and probative. Although somewhat cumulative, there was no undue consumption of time because the clips shown to the jury totaled 36 seconds. Additionally, Spinelli's emotions were already revealed to the jury through the audio of her 911 call. Under these circumstances, admission of the two clips was not arbitrary or capricious, and we find no abuse of discretion.

14

4. Unwashed Autopsy Photographs

The People sought to admit 15 autopsy photographs. Five were taken before Keshishian's body was washed, and 10 were taken after. Razan objected to the unwashed photographs. The trial court admitted two of the disputed photographs, one of Keshishian's front and another of his back, finding them relevant to the cause of death and malice. The trial court excluded the other three as cumulative.

Razdan argues the trial court erred in admitting the unwashed photographs. He claims the relevant facts regarding the cause and manner of Keshishian's death were undisputed, and the unwashed photographs were cumulative of the other 10 autopsy photographs and the medical examiner's testimony.

Razdan disputed the manner of Keshishian's death. Razdan claimed self-defense, while the People asserted premeditation and deliberation. The unwashed photographs were relevant to that dispute because they depicted Keshishian's blood covered body, which Razdan would have seen as he continued his attack on a disrobed Keshishian. The bloody crime scene and body also support an inference that an assailant would flee such a situation. This supports giving the flight instruction. Additionally, " '[p]hotographs and other graphic evidence are not rendered "irrelevant or inadmissible simply because they duplicate testimony [or] depict uncontested facts." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 367.) " 'The prosecution is not limited to proving its case "solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 42.) Finally, the unwashed photographs were no more disturbing that the unchallenged

15

cleaned ones, so they were not " 'so gruesome as to have impermissibly swayed the jury.' " (*Ibid*.)  Once again, we see no abuse of discretion here.[1]

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

---

[1]     Having found no error, we reject Razdan's claim of cumulative error.